FILED
2012 Sep-21  AM 09:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **ASHLEY LINDLEY,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **Civil Action No.** |
| ] | **5:11-BE-1116-NE** |
| **MICHAEL J. ASTRUE** ] | |
| **COMMISSIONER OF** ] | |
| **SOCIAL SECURITY,** ] | |
| ] | |
| **Defendant.** ] | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On November 15, 2006, the claimant, Ashley Lindley, applied for disabled adult child benefits (DAC) under the record of her father, Ricky Lindley, a wage earner, and supplemental security income (SSI) as an adult, under Tiles II and XVI of the Social Security Act. (R. 30). The claimant alleged disability commencing on November 2, 2005 because of learning disability, type II diabetes, and muscle weakness. (R. 90). On December 15, 2006, the Alabama Department of Disability Services (DDS) found the claimant mentally retarded since birth and that she met listing 12.05C. On January 22, 2007, the Atlanta Disability Quality Branch (DQB) issued a Request for Corrective Action, but on April 9, 2007, the DDS confirmed its finding of mental retardation. On May 21, 2007, the Commissioner denied the claims. (R. 51-55, 105-106, 1633-1637).

The claimant filed a timely request for a hearing before an Administrative Law Judge, and

1

the ALJ held a video conference hearing on February 27, 2009. (R. 1778). In a decision dated April 10, 2010, the ALJ declared the claimant not disabled as defined by the Social Security Act and, thus, ineligible for disabled adult child benefits or supplemental security income. (R. 46). After receiving more medical records and a letter from the claimant's employment transition counselor, the Appeals Council denied the claimant's request for review, which made the ALJ's decision the final decision of the Commissioner of the Social Security Administration on March 31, 2011. (R. 10, 90). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the decision of the Commissioner will be reversed and remanded.

## II. ISSUE PRESENTED

Whether substantial evidence supports the ALJ's determination that the claimant's IQ scores of 67 and 64 were inconsistent with the record, justifying the ALJ's finding that the claimant did not meet listing 12.05(C).

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper legal standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*.

2

The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

A person with an impairment that is listed in 20 C.F.R. Subpart P, Appendix 1 will be found disabled without consideration of age, education, or work experience. 20 C.F.R. § 1520(d). "To be considered for disability benefits under section 12.05, mental retardation, a claimant must at least have 1) significantly subaverage general intellectual functioning; 2) deficits in adaptive functioning; and 3) manifested deficits in adaptive functioning prior to age twenty-two." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). A claimant meets the required severity of mental retardation under sub-section 12.05(C) when the claimant presents a valid verbal, performance, or full-scale I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05C; *Edwards by Edwards v. Heckler*, 759 F.2d 1513, 1517 (11th Cir. 1985) (defining a "significant" limitation as something more than slight or minimal but less than "severe"). However, the Eleventh Circuit has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986).

## V. FACTS

The claimant, twenty years old at the time of the ALJ hearing, alleges specific disabilities of mental retardation, degenerative disk disease, subjective muscle weakness, type II diabetes, and syncope. (R. 33). The claimant completed an Individualized Education Program (IEP) from the Morgan County School system and earned an Alabama High School Graduation Certificate in

May 2007. A Graduation Certificate, suited for students with disabilities and generally not accepted by post-secondary institutions and military recruiters, purports to prepare students for their post-school transitional goals. (R. 146, 269). The claimant has no prior work experience. (R. 32-33).

*Physical Limitations*

**Seizures/Syncope**

The claimant suffered a seizure when she was seven months old. (R. 506). In mid-November 2003, at age fifteen, the claimant suffered three syncopal (fainting) episodes and sought treatment at Cullman Regional Medical Center. Dr. Brian Wiseman, the claimant's first treating neurologist at North Central Neurology Associates, believed that hyperventilation syndrome probably caused the claimant's collapses that he considered syncopal episodes, not seizures. (R. 1051). The claimant's medical records characterize the spells as a feeling of chest tightness followed soon thereafter by light-headedness, but medical records also indicate the episodes are usually very brief in duration and spontaneously resolve. (R. 810).  The claimant currently takes Topamax, a seizure medication, which effectively controls her episodes unless she gets nervous or upset. (R. 1785, 1817).

**Subjective Muscle Weakness**

On September 25, 2003, the claimant complained to Dr. Wiseman that over the previous two months she experienced progressively worsening weakness and fatigue in her upper and lower extremities. The claimant told Dr. Wiseman that she first noticed the weakness when she could not raise herself up off the floor in school, keep up with the other kids in P.E. like she used to do, or climb into a truck. Dr. Wiseman ordered electromyography testing that equivocally

suggested non-necrotizing myopathy, but did not provide a definitive diagnosis. Dr. Wiseman also noted that the claimant's symptoms could possibly indicate the presence of dystrophic disorder (deterioration of tissues most commonly seen as muscular dystrophy). (R. 815-817).

In December of 2003, the claimant visited neurologist Dr. Christopher LaGanke, also of North Central Neurology Associates, and complained of muscle weakness. Dr. Laganke advised that she obtain a second opinion from the Muscular Dystrophy Clinic. (R. 507). In January of 2005, the claimant complained to pediatrician Dr. Mark Addison of chronic malaise and fatigue. (R. 509).

Because the claimant fell behind in school as a result of her muscle weakness, Morgan County Schools allowed her to participate in homebound studies beginning in April 2004. (R. 231, 1782). Despite no such objective medical diagnosis in the record, conference records indicate that the IEP committee believed that the claimant had muscular dystrophy. (R. 233). On April 6, 2005, a year after the claimant began homebound studies, Dr. Wiseman wrote a letter to the school, addressed "To Whom It May Concern," stating that the claimant cannot walk very far because of back pain, chronic fatigue, peripheral neuropathy, and syncope. Dr. Addison, in a letter dated August 11, 2005, addressed "To Whom It May Concern," indicated that the claimant has "what seems to be a form of muscular dystrophy" and could attend school for approximately four hours, but should not participate in physical education. (R. 875-877).

In October of 2007, Dr. Liang Lu examined the claimant as a consultation for the Muscular Dystrophy Association. Dr. Lu found that the claimant had no clinical evidence of muscular dystrophy, only subjective weakness or possible metabolic myopathy as a result of diabetes. (R. 1036-1037). The claimant underwent two muscle biopsies in October and

November 2007, and neither reported any signs of cancer. (R. 513, 1028).  The claimant currently takes the muscle relaxer Robaxin for muscle weakness. (R. 1785, 1789).

**Back/Neck/Leg Pain**

In November of 2004, the claimant complained of lower back pain to Birmingham pediatrician Dr. Angela Redman. (R. 509). One month later, the claimant told Dr. Wiseman that she suffered from lower back discomfort and numbness to the plantar aspect of her feet. Prior to the December 2004 visit to Dr. Wiseman, the claimant had previously participated in physical therapy for foot numbness, but she abruptly stopped therapy when it increased her lower back discomfort. (R. 802). An MRI taken in April of 2005 returned negative results for any thorasic and lumbar conditions. (R. 509).

In August 2005, Dr. Wiseman referred the claimant to neurologist Dr. Sheri Swader who reviewed the claimant's negative EEG, EMG, and MRI tests and found no underlying myopathy or dystrophy. Dr. Swader recommended light activity to relieve the claimant's muscoloskeletal pain. (R. 776). From March to May 2006, the claimant attended Sportsfirst Rehabilitation for her back pain. At Sportsfirst, the claimant participated in aquatic and group therapy and also learned how to reduce her pain through stretches, exercises, and proper movements for household activities. (R. 511, 1369-1375).

On October 31, 2006, Dr. LaGanke ordered an MRI on the claimant that revealed mild degenerative cervical disc disease. (R. 512). On August 21, 2007, Children's Hospital in Birmingham noted that the claimant's joints were swollen and her back "pain waxes and wanes," but her lower back exam showed no specific areas of bony point tenderness. (R. 897).

In November 2008, the claimant complained to Dr. LaGanke about pain, tingling, and

numbness in her legs and feet. Dr. LaGanke's notes from that visit state that the claimant "is unable to stand for long periods of time due to tingling and numbness as well as pain in feet and hands." Dr. Laganke's notes also reveal that the claimant often struggles to fall asleep at night because of her leg pain. (R. 1605).  The claimant currently takes Requip for restless leg syndrome. (R. 515).

Beginning in 2004, the claimant sporadically complained of neck pain to both Dr. Addison and Dr. LaGanke. (R. 506-523). While the Physical Residual Functioning Questionnaire completed by Dr. LaGanke states that the claimant suffers from persistent neck pain with numbness and tingling in all extremities, numerous visits reveal that the claimant's neck pain was under control or wholly absent. (R. 42, 880, 881, 1046, 1601). The Robaxin the claimant takes for muscle weakens also helps her neck pain according to medical records; however, medical records also indicate that the Robaxin causes the claimant's significant drowsiness. (R. 1605).

**Diabetes/Asthma**

On November 5, 2003, pediatrician Dr. Mark Addison of Cullman Regional Medical Center diagnosed the claimant with asthma. The claimant currently takes Singulair for asthma, but still suffers frequent attacks when she over-exerts herself. On October 27, 2004, Dr. Addison diagnosed the claimant with hyperglycemia and type II diabetes. The claimant's medical records indicate that her hands and feet swell as a result of the diabetes, but none of the claimant's numerous doctors has affirmatively diagnosed metabolic myopathy as the source of her back and leg pain. (R. 507, 509).

*Mental Limitations*

The claimant's medical records indicate at several places that the claimant suffered

8

developmental disabilities from an early age. Dr. Wiseman's notes indicate that the claimant walked at two years old, talked at two-and-a-half years, and fell frequently as a child. (R. 1052).

The claimant enrolled in special education classes for language, reading, spelling, and math beginning in kindergarten. Elementary school records indicate that the claimant's teachers found her pleasant and hardworking, but that she required special teaching and testing accommodations, including basing some course grades entirely on participation. (R. 452-457). The claimant took the Otis-Lennon School Ability Test (OLSAT) in third, fourth, and fifth grade; however, her scores widely varied within the bottom third of the national percentiles. (R. 440, 449-450). In 1994 and 1997, Morgan County School System administered IQ tests on the claimant. In 1994, the five-year-old claimant scored a full scale IQ score of 78, and in 1997, she scored a full scale IQ score of 77. (R. 371). Both the 1994 and 1997 scores placed her in the borderline to low average range of intelligence.

The claimant's 2002 IEP report, written when the claimant was in seventh grade, estimated that the claimant showed reading skills at the 4.5 grade level and math skills at the 3.7 grade level. (R. 420). When the claimant was in tenth grade, at age fifteen, a teacher questionnaire estimated that the claimant operated at a ten years or younger age equivalency in all academic areas. (R. 371). A teacher questionnaire completed when the claimant was in twelfth grade, two days shy of her eighteenth birthday, placed the claimant's age equivalents at 9.9 years for reading comprehension; 8.8 years for reading; 10.10 years for math calculation; 10.5 years for applied math reasoning; 10.1 years for broad math reasoning; and 8.9 years for written language. (R. 246).

The claimant originally attempted to gain an Alabama Occupational Diploma, but she did

9

not complete any of the 270 hours of required job shadowing.  (R. 269, 33). Beginning in April 2004, Falkville High School allowed the claimant to receive homebound studies because of her medical problems. Her course load throughout high school, although not entirely comprised of special education classes, focused on providing the claimant with basic life, employment, and personal skills while attempting to marginally improve her poor academic performance. (R. 274). The claimant achieved her two biggest academic goals outlined in her IEP: create comprehensible paragraphs and master fractions. While the claimant never failed a class, her IEP allowed several grading accommodations including not counting off for spelling errors and only counting semester examinations that improved her overall grade average. (R. 291, 300). The claimant attempted all portions of the Alabama High School Graduation Exam twice, but she failed all portions both times. (R. 275).

On December 12, 2006, psychologist Dr. John Haney evaluated the claimant as a consultation for DDS and administered the Wechsler Adult Intelligence Scale (WAIS) test. The claimant tested at a verbal scale score of 78, a performance scale score of 73, and a full scale IQ score of 67. Judging by the test results that scored in the mild range of mental retardation and Dr. Haney's own observations of the claimant, he determined that she suffered from mild mental retardation. (R. 788-789). Dr. Haney specifically noted that his test results were "a reasonably accurate estimate of the current level of intellectual functioning."

Three days later, on December 15, 2006, the DDS determined the claimant mentally retarded since birth and that she met listing 12.05C. (R. 51). In its disability report, the DDS specifically noted that the claimant's previous IQ tests completed at age five and eight were poor indicators of the claimant's current intellectual functioning. DDS found that the claimant's IQ in

December of 2006 to be in the 67-73 range and consistent with mild retardation. (R. 824).

On January 22, 2007, Dr. Cal VanderPlate, a board-certified psychology specialist for the Atlanta Disability Quality Branch (DQB), issued a request for corrective action finding the DDS's determination based on insufficient facts. Having never examined the claimant, Dr. VanderPlate reviewed her previous IQ testing, educational records, and other evidence in the record before finding that the claimant functioned in the borderline to low average range of intelligence. Dr. VanderPlate found the results of Dr. Haney's IQ test "rather sketchy and not very useful in confirming adaptive functioning." Dr. VanderPlate instead preferred to rely on the claimant's earlier testing at age five and eight and the teacher questionnaire from October 2006. The DQB instructed the DDS to further investigate the claimant's functional limitations resulting from her mental impairments, confirm the validity of Dr. Haney's test results, and procure more examinations of the claimant if necessary. (R. 105-106).

On April 9, 2007, after contacting Dr. Haney and the claimant's homebound teacher, the DDS confirmed that the claimant met listing 12.05C. (R. 53). The DDS again pointed to the past IQ scores as not "stable" and gave great weight to Dr. Haney's evaluation and the opinion of the claimant's homebound teacher. (R. 865). On April 29, 2007, Dr. VanderPlate again disagreed with DDS findings, continued to discredit Dr. Haney's test results, and interpreted the homebound teacher's testimony as confirming the presence of a specific learning disability, not mental retardation. (R. 873). On May 21, 2007, DDS issued a medical denial of benefits to the claimant. (R. 55).

On January 19, 2009, the claimant's attorney referred her to psychologist Dr. Alan D. Blotcky, who performed a consultative examination. Dr. Blotcky administered another WAIS test

on the claimant, who this time scored a verbal scale score of 69, a performance scale score of 64, and a full scale IQ of 64. The claimant scored lower in every area on the 2009 WAIS than on the previous WAIS test administered by Dr. Haney in 2006. Before he diagnosed the claimant with mild mental retardation, Dr. Blotcky noted that the claimant was motivated during the exam and that her test scores were valid. (R. 1621 - 1622).

### The ALJ Hearing

After the Commissioner denied the claimant's disability requests, the claimant requested and received a hearing before an ALJ on February 27, 2009. (R. 1778). At the hearing, held via video conference, the claimant testified that Math and English gave her the most trouble in school and that she participated in self-contained special education classes since Kindergarten. (R. 1780-1782). According to the claimant, she began homebound studies in ninth grade because muscle weakness and diabetes prevented her from sitting for long periods of time and walking up the stairs. The claimant testified that she lives with her mother, who works afternoon and night shifts, and her disabled father. (R. 1791). The claimant alleged that because of restless leg syndrome, she cannot sit for more than fifteen to twenty-five minutes without her legs hurting. (R. 1799). She further alleged that because of her muscle weakness she cannot walk for more than fifteen to twenty minutes without having to sit down and rest. (R. 1805). The claimant testified that because of her muscle weakness she cannot stoop down and get back up, cannot climb a ladder, and cannot climb a flight of stairs. (R. 1803, 1806).

At the hearing, the claimant testified about her typical day. The claimant testified that she usually goes to bed around eleven at night and wakes up around eleven in the morning. Upon awakening, she fixes herself breakfast, then takes her medicine: Robaxin for muscle weakness;

Glucophage for diabetes; Topamax for seizures; Sudedol for allergies; Zantac for acid-reflux; Lipitor for high cholesterol; Requip for restless leg syndrome; and Singulair for asthma. After breakfast, the claimant testified that she lies down for thirty minutes to an hour because the Robaxin makes her tired. After she gets up and eats lunch, the claimant testified that she watches TV in a recliner to keep her legs elevated. After about an hour of TV, the claimant usually walks around the house and may clean laundry or dishes; however, she testified that she must take frequent breaks to rest her hurting back and legs, and the breaks greatly prolong these tasks. The claimant testified that she sometimes gets on the computer in the afternoons, but she quickly loses concentration and gives up within thirty minutes. Late in the day, she usually sits down in the recliner and shuts her eyes. The claimant often cooks dinner for herself and her father, usually casseroles. (R. 1783- 1790).

The claimant testified that she sometimes goes to the movies, the mall, or to church; however, she cannot walk in the mall for more than twenty minutes without taking a break, she cannot sit for extended periods of time at church or the movies, and she experiences painful swelling in her hands and feet when she over-exerts herself. The claimant also likes to sew, a skill she learned in school, but she cannot sew for more than thirty to forty minutes without her back hurting.  (R. 1791 - 1795, 1799, 1807).

The claimant admitted that she cannot remember more than one thing to do at a time and cannot stay on one task for more than thirty to forty minutes before having to do something else. (R. 1808-1809). The claimant does not shop for groceries and does not pay bills. She cannot make change and cannot count minutes on a non-digital clock. (R. 1791-1793). The claimant testified that she sometimes babysits, but cannot babysit for more than three hours because the

noisy children bother her and cause her significant stress. The claimant reads books by Mary Higgins Clark but does not retain what she reads. The claimant testified that her only friend is her seventeen year-old cousin and that she never goes anywhere alone without her parents, her sisters, or her cousin. (R. 1795 - 1796, 1807).

The claimant's attorney then questioned the claimant's mother, Della Lindley. The claimant's mother testified that doctors have not been able explain to her why her daughter's tests come back negative; however, she strongly believes that the doctors' prescribed medications help her daughter's symptoms. (R. 1817). The claimant's mother testified that the claimant received a graduation certificate for what she believed was a third grade education level. (R. 1821). The claimant's mother also confirmed the claimant's testimony that she cannot remember more than one task at a time, cannot tell time except on a digital watch, cannot count money, and does not go anywhere by herself. She also confirmed that the claimant cannot stand or walk for more than twenty to thirty minutes without needing to sit and rest. (R. 1830).

A vocational expert, Ms. Melissa Neel, testified concerning the type and availability of jobs that the claimant could perform. The ALJ asked Ms. Neel to assume an individual of the claimant's age and educational background with no work history. The ALJ further asked Ms. Neel to limit the individual to a reduced range of light work with the following limitations: should only occasionally climb ramps and stairs; should not climb ropes, ladders, or scaffolding; should avoid concentrated exposure to cold, heat, wetness, humidity, dust, fumes, and other gases; should not work at unprotected heights; and could occasionally perform activities such as stooping, kneeling, and crouching. The ALJ further limited this individual to unskilled work with no more than occasional contact with supervisors, coworkers, and the general public. That

hypothetical individual, Ms. Neel testified, could work jobs as an inspector or a packer. Ms. Neel further testified that jobs as inspectors and packers exist in significant numbers both in Alabama and throughout the national economy. (R. 1834 - 1835).

The ALJ then asked Ms. Neel if work exists for the same hypothetical individual with the following additional limitations: marked to extreme difficulties with social functioning; inability to appropriately respond to coworkers, supervisors, and the general public; inability to follow simple one- and two-step instructions; and inability to maintain attention, concentration, and pace for two hours while responding to customary work pressures. In response to the new stipulations, Ms. Neel testified that she did not believe jobs exist for a person with those limitations. (R. 1834 - 1835).

The ALJ then asked Ms. Neel to assume that the individual would need frequent work breaks beyond those that are generally scheduled for most unskilled jobs. Ms. Neel opined that unskilled work would not be available to a person that requires frequent, unscheduled breaks. The ALJ then asked Ms. Neel to assume that the individual would struggle with  absenteeism as a result of physical or mental problems that would amount to more than four absences per month. Ms. Neel again believed that work would not be available for this hypothetical person. The ALJ lastly asked Ms. Neel to assume that the individual could not pay attention and concentrate for periods of up to two consecutive hours. Ms. Neel again believed no jobs exist in the national economy for a person with these limitations. (R.1834 - 1837).

*The ALJ Decision*

On November 16, 2006, the ALJ issued a decision finding the claimant not disabled as defined by the Social Security Act. (R. 46). First, the ALJ found that the claimant had not

engaged in substantial gainful activity because no evidence exists showing that the claimant had ever worked. Next, the ALJ held that the claimant had the following severe impairments: borderline intelligence, but no mental retardation; subjective weakness in the extremities, but no objective disorder; occasional syncope, but no objective seizure disorder; and mild degenerative disk disease of the cervical spine, but no bulging lumbar disks. In finding the record as a whole more consistent with borderline intelligence than mental retardation, the ALJ determined that the claimant's impairment or combination of impairments did not meet or medically exceed one of the listed impairments in 20 CFR Pt. 404, Subpart P, Appendix. 1. (R. 32-34, 44).

To justify his finding of borderline intelligence over mental retardation, the ALJ gave great weight to the opinion of the non-examining DQB consultant Dr. Cal VanderPlate. The ALJ noted that Dr. VanderPlate reviewed the intelligence testing in the record, educational records, and adaptive functioning information before he reversed the findings of DDS. The ALJ agreed with Dr. VanderPlate's opinion that the claimant functions in the borderline to low average range of intelligence and that she exhibited a specific learning disability rather than mental retardation. As noted by the ALJ, Dr. VanderPlate believed that physical rather than mental problems caused the claimant's limitations in pace and that the claimant's lack of psychopathological and behavioral problems indicated proper adaptive functioning. (R. 36-37).

The ALJ found that the claimant's educational records and daily activities supported Dr. VanderPlate's opinion that the claimant has borderline intelligence and, therefore, does not meet listing 12.05C for mental retardation. The ALJ looked to school records that indicate that the claimant repeated no grades; never had a discipline problem; obtained a learner's permit; came "very close" to passing the reading portion of the Alabama High School Graduation Exam; and

earned a high school graduation certificate. Furthermore, the ALJ pointed out that the claimant herself reported that she participates in church activities, spends time with her niece and cousin, sews, and baby-sits. Lastly, the ALJ interpreted the claimant's ability to remember her numerous medications to mean the her intellectual functioning falls within the borderline range with proper adaptive functioning. Based on Dr. VanderPlate's report and the claimant's educational records and daily activities, the ALJ found that the claimant's borderline to low average range intelligence was a severe impairment, but resulted in no more than mild to moderate restriction of activities of daily living; mild to moderate difficulty with maintaining social functioning; and mild to moderate difficulty with maintaining concentration, persistence, and pace. (R. 37 - 38).

The ALJ afforded great weight to the claimant's March 1994 and April 1997 IQ test results and gave little weight to the more recent IQ tests and evaluations administered by consultative examining physicians Dr.  Haney and Dr. Blotcky, both of whom diagnosed the claimant as mildly mentally retarded. Among other reasons, the ALJ discredited the opinions of the consultative psychologists as inconsistent with the record.

The ALJ discredited Dr. Haney's 2006 opinion largely because the psychologist failed to discuss the inconsistency of his test results, most notably a full scale IQ of 67, with the claimant's previous educational achievement and IQ scores of 77 and 78. The ALJ assumed that Dr. Haney failed to discuss inconsistencies because he had no access to the claimant's records as he was retained by DDS for a one-time consultative evaluation. Dr. Haney also did not discuss any deficits in the claimant's adaptive functioning in his evaluation, so the ALJ believed he did not fully address whether the claimant met listing 12.05 for mental retardation. Because Dr. Haney relied so heavily on the results of the intelligence test that the ALJ believed were inconsistent

17

with the record, lacked access to the claimant's educational records, and failed to discuss deficits in adaptive functioning, the ALJ gave his opinion of the claimant's mental impairment little weight. (R. 38 - 39).

The ALJ discredited Dr. Blotcky's 2009 opinion for similar reasons that he discredited Dr. Haney's opinion, including his belief that evidence in the record directly conflicted with Dr. Blotcky's evaluation. The ALJ determined that the claimant's reported daily activities and school records do not support Dr. Blotcky's opinion of marked and extreme limitations in social functioning and judgment. The ALJ found that Dr. Blotcky provided no justification for his diagnosis of dependent personality disorder and found it inconsistent with the record that contains no other diagnosis of any psychopathological or behavioral disorders. Dr. Blotcky, like Dr. Haney, did not discuss deficits in adaptive behavior, so the ALJ did not believe his evaluation properly addressed the claimant's alleged mental retardation; therefore, he gave it little weight. (R. 39).

The ALJ gave little evidentiary weight to the March 2007 statements to DDS given by the claimant's homebound teacher that reported that the claimant requires frequent prompting to complete assignments. The ALJ rejected the 2007 report because the same teacher in October 2006 completed a questionnaire that reported the claimant has "no problem" paying attention or focusing long enough to complete assignments. Answers to the October 2006 questionnaire also reported that the claimant worked independently and asked for help when needed. (R. 43).

The ALJ determined that the claimant suffered from subjective weakness, but no objective muscular disorder. The ALJ based this determination on normal findings on medical tests including muscle biopsies and cranial MRI studies, as well as several specialists that have

all diagnosed the claimant with "subjective weakness." The ALJ, despite finding no objective muscle disorder, considered the claimant's treatment for musculoskeletal pain and myalgias when he placed various restrictions on her residual functional capacity. (R. 40 - 41).

The ALJ found the claimant's allegation of disability in part resulting from seizures inconsistent with the objective evidence in the record that supports only occasional syncopal episodes. The ALJ noted that the claimant has undergone multiple normal neurological examinations and negative EEG's and denied seizure activity at multiple doctor's visits. Despite the claimant's treatment for seizures and allegations that she suffered seizures beginning at age seven months, the ALJ determined that the claimant's medical record does not support a finding of objective seizure disorder, only subjective syncopal episodes and vasovagal symptoms. (R. 40).

The ALJ concluded that the claimant's mild cervical degenerative disk disease resulted in no motor or sensory deficits. The ALJ consulted Dr. Laganke's records that show the claimant only has mild flares of neck pain that are relieved with ibuprofen and have little to no effect on her ability to perform work-related functions. As the claimant has routinely shown no acute distress when seen for treatment, the ALJ determined that mild cervical disk disease did not affect her ability to work. (R. 40).

After determining the claimant's severe impairments at step two of the analysis, the ALJ next found that the claimant retained the residual functional capacity to perform a reduced range of light work. The ALJ decided the claimant could work with the following limitations: she can occasionally climb ramps and stairs, but should avoid climbing ropes, ladders, or scaffolding; she can occasionally stoop, kneel, and crouch; she should avoid concentrated exposure to cold, heat,

wetness, humidity, dust, fumes, and other gases; and she should not work at unprotected heights. He lastly found that her work should be unskilled in nature and that she should not have more than occasional contact with supervisors, coworkers, and the general public. (R. 34).

In making his determination of the claimant's residual functioning capacity, the ALJ gave great weight to the claimant's testimony regarding her daily activities and rejected the opinions of treating physicians Dr. LaGanke and Dr. Wiseman. The ALJ believed that the claimant's testimony regarding her daily activities supported his finding of residual functioning capacity more than the doctors' opinions. The ALJ found especially persuasive the claimant's reports that she does light housework, baby-sits for up to three hours at a time, can stand about fifteen to twenty minutes, can pick up ten to fifteen pounds, and can sit thirty to forty-five minutes on the computer and thirty to forty minutes at a sewing machine. The ALJ concluded that these activities are consistent with the ability to perform work-related functions such as sitting, standing, walking, lifting, pushing, pulling, reaching, carrying, and handling. The ALJ also believed the claimant's ability to remember nine different prescribed medications, what they are prescribed for, and how often to take them, showed sufficient memory and concentration to carry out assigned tasks in a work setting. (R. 40 - 41).

In giving little weigh to the Physical Residual Functional Capacity Questionnaire completed by Dr. LaGanke in November of 2008, the ALJ questioned the validity of the form that contained multiple handwritings and checkmarks. Moreover, the ALJ found the information provided in the form inconsistent with Dr. LaGanke's own objective findings. Dr. LaGanke wrote that EEG studies have been abnormal, but his records reveal normal "negative" EEG results. The ALJ also found Dr. LaGanke's finding of unstable seizures and persistent neck pain inconsistent

20

with Dr. LaGanke's routine findings of only slight lightheaded or syncopal episode and occasional flare-ups of neck pain that are well controlled with ibuprofen. (R. 42).

The ALJ gave no weight to the April 2005 letter from Dr. Brian Wiseman stating that the claimant had difficulty walking because of back pain, chronic fatigue, peripheral neuropathy, and syncope. The ALJ gave this letter no weight because he found it devoid of objective findings to support the opinion, contrary to objective evidence in his own records, and apparently altered in an attempt to read April 6, 2006 instead of April 6, 2005. The ALJ also found the 2006 date inconsistent with the record because Dr. Wiseman last treated the claimant in April 2005. (R. 42 - 43).

In concluding that the claimant retained the residual functional capacity to perform light work, the ALJ relied on the claimant's activities of daily living; her statements regarding her functional abilities; and lack of objective medical findings of muscle atrophy, muscular dystrophy,  instability, stenosis, or motor or sensory loss. (R. 43 - 44).

Based on the vocational expert's testimony, the claimant's severe impairments, and the claimant's residual functioning capacity, the ALJ decided that the claimant can perform inspector jobs, assembler jobs, and packer jobs. As these jobs exist in significant numbers across the national economy, the ALJ determined that the claimant was not disabled under the Social Security Act. (R. 45).

Finally, the ALJ clarified that the record shows that the claimant received non-disability auxiliary benefits on her disabled father's record beginning in 1991. The claimant stopped receiving those benefits in May 2007 when she finished high school and ended eligibility for such benefits as a full-time student. Therefore, the claimant was not receiving disability benefits

previously and had no prior determinations or decision as to the issue of disability. (R. 44).

## VI. DISCUSSION

The claimant argues that she is entitled to benefits because she meets the criteria for listing 12.05(C). This court finds that substantial evidence does not support the ALJ's finding that the claimant fails to meet listing 12.05(C), and it will reverse and remand this case for the ALJ to properly consider the evidence.

The court notes that not only is the ALJ's factual conclusion that the claimant does not meet listing 12.05(C) unsupported by substantial evidence, but the ALJ did not even mention the specific requirements for establishing an impairment under listing 12.05(C) in the "Applicable Law" section of his opinion. Generally, where a claimant's condition manifests itself prior to age twenty-two, the claimant meets the criteria for *presumptive disability* under section 12.05(C) when she presents both a valid IQ score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than a "minimal effect" on the claimant's ability to perform basic work activities. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05(C); *Edward by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985).

Given that her condition manifested itself prior to the age of twenty-two, the ALJ improperly ignored the fact that the claimant satisfied the two criteria for "presumptive disability" under listing 12.05(C). As the Commissioner's brief concedes, the claimant's record contained <u>two</u> objectively valid IQ scores between 60 and 70 inclusive, and the ALJ himself determined that the claimant suffered from three separate severe physical impairments (subjective weakness, occasional syncope, and mild degenerative disk disease) that substantially affect her ability to perform work-related functions. Although the ALJ gave little weight to the

medical opinions of examining psychologists Dr. Haney and Dr. Blotcky, he never stated that the IQ test results they returned were invalid. In fact, the ALJ in his opinion failed to even mention the specific criteria of listing 12.05(C), but instead focused on weighing various medical opinions and educational records to justify his finding of borderline intelligence.

The Eleventh Circuit has recognized that a valid IQ score need not be conclusive of mental retardation when the IQ score is inconsistent with other evidence in the record of the claimant's daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986). While the Eleventh Circuit in *Popp* indicated that the ALJ could circumvent the presumptive disabilities in the listings if he found that the IQ test results are inconsistent with the record on the claimant's daily activities and behavior, the facts of this case do not align with the facts in *Popp*. In *Popp*, the Eleventh Circuit upheld the decision of the ALJ to reject a claim of listing 12.05(C) mental retardation where the claimant's only IQ score of 69 was inconsistent with evidence that he had a two-year college associate's degree; was enrolled in his third year of college as a history major and was not alleged to be failing; and had worked in various technical jobs such as an administrative clerk, a statistical clerk, and an algebra teacher. The Eleventh Circuit held that substantial evidence supported the ALJ finding that the results of the IQ tests were incredible because they were inconsistent with other evidence in the record and because good reason existed to believe that the claimant in *Popp* had exaggerated his mental and physical problems.

The claimant in the present case is nothing like the claimant in *Popp.* The claimant in the present case tested at two full scale IQ scores of 67 and 64, and no evidence indicates that she exaggerated her problems. Both Dr. Haney and Dr. Blotcky's narrative reports comment on the

validity of their test results as accurate statements of the claimant's intellectual functioning. The claimant's IQ scores in the mild mentally retarded range are consistent with the record that shows she has never worked; she took special education classes starting in kindergarten; she cannot tell time on a non-digital watch; she cannot count change; she cannot drive; she failed every portion of the Alabama High School Graduation Exam twice; and she never goes anywhere by herself.

When the claimant meets the specific criteria for listing 12.05(C), a presumption exists that she is disabled. While an ALJ may overcome that presumption by disregarding an IQ test as inconsistent with evidence in the record, the ALJ in this case has failed to make that showing and substantial evidence does not justify his disregard of the claimant's more recent IQ scores of 67 and 64. First, the ALJ incorrectly relied on the claimant's past IQ test scores of 78 and 77 at ages five and eight respectively. While the ALJ was entitled to consider the past IQ scores as longitudinal evidence, the DDS noted that the claimant's IQ scores at age five and eight were poor indicators of the claimant's *current* intellectual functioning. The claimant's previous IQ scores are especially poor indicators of her current level of intellectual functioning because every subsequent IQ score has been worse than the one before it. The falling IQ scores, all administered prior to the claimant turning twenty-two, clearly show a trend of worsening mental retardation, not borderline intelligence.

The ALJ also used evidence that the claimant never repeated a grade, never had a discipline problem, and "almost" passed the reading portion of the Alabama High School Graduation Exam to justify his finding of borderline intelligence over mental retardation. The fact that the claimant never repeated a grade provides no barometer for the claimant's intellectual functioning because her Individualized Education Program allowed special grading

24

accommodations throughout her special education course work, including grading based on participation during some courses. Furthermore, the fact that the claimant never had a discipline problem speaks to her demeanor, not her intellectual functioning. *Almost* passing the reading portion of the Alabama High School Graduation exam does not discredit the IQ test results, especially when the claimant failed all portions of the graduation exam twice.

The ALJ also stated that the claimant's ability to perform light housework, baby-sit for a few hours, use a sewing machine, take her medications, and perform work-related functions such as standing, walking, and reaching were inconsistent with her IQ scores of 67 and 64. Evidence of the claimant's daily behavior that she performs light housework, baby-sits, and takes her medication also does not provide substantial evidence necessary to disregard the claimant's valid IQ scores. Performing light housework does not disprove the claimant's mild mental retardation as most light housework such as sweeping, laundry, and dishes demand very little intellectual capacity. The fact that claimant sometimes baby-sits also does not disprove her IQ scores in the mild mentally retarded range because the record does not contain any details of her baby-sitting, such as the age of children she baby-sits or even if she baby-sits alone. Furthermore, the claimant's IQ scores of 67 and 64 place her in the range of mild mental retardation, which would lead a reasonable person to believe that she could be capable of shouldering some minor responsibilities, such as light housework or baby-sitting. The fact that the ALJ determined that the claimant can undertake some responsibility does not render her IQ scores incredible. The finding of the ALJ and Dr. VanderPlate that the claimant can perform work-related functions, such as standing, walking, or reaching, does not provide grounds for disregarding her IQ scores either. Even a severely mentally retarded person can stand, walk, reach, and sit, but that does not

render her any less retarded.

This court finds that the evidence used by the ALJ to disregard the claimant's valid IQ scores of 67 and 64 does not constitute substantial evidence necessary to justify overcoming the presumption of disability served by the listings, especially when combined with the evidence cited above heavily supporting the claimant's poor intellectual functioning. The ALJ's lack of substantial evidence to show the IQ scores inconsistent with the record is especially apparent after two examining psychologists diagnosed the claimant with mild mental retardation and the DDS determined that the claimant met listing 12.05(C) even after the DQB made a request for corrective action. Substantial evidence does not support the ALJ's finding that the claimant's IQ scores were inconsistent with her level of intellectual functioning. Therefore, the ALJ erred in disregarding both of the more recent IQ scores that fell squarely within the range of the 12.05(C) listing.

Because the first issue on appeal is meritorious, the court does not need to address any further issues.

## VII. CONCLUSION

For the reasons stated, this court concludes that substantial evidence does not support the ALJ's factual conclusion that the claimant fails to meet listing 12.05(C). Therefore, the court will REVERSE the Commissioner's decision and will REMAND it for the ALJ to determine whether the claimant is entitled to Supplemental Security Income. The court will enter a separate order to

that effect simultaneously.

DONE and ORDERED this 21st day of September, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE